UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
LEWIS SMALL, Individually and as       :
Trustee of the RICHARD SMALL VOTING    :
TRUST and the AMERICAN INDEPENDENT     :
COMPANY VOTING TRUST, RICHARD SMALL,   :   03 Civ. 5604(JFK)
DAVID WILSTEIN, LEONARD WILSTEIN,      :   **OPINION and ORDER**
DENISE WILSTEIN, GARY WILSTEIN,        :
RONALD WILSTEIN and FREDERICK GITTERMAN, :
                                       :
                 Plaintiffs,           :
                                       :
         -against-                     :
                                       :
ARCH CAPITAL GROUP, LTD., AMERICAN     :
INDEPENDENT INSURANCE HOLDING COMPANY, :
TDH CAPITAL PARTNERS, TDH III, L.P.,   :
JOSEPH KING, and WILLIAM B. LOCKHORN,  :
                                       :
                 Defendants.           :
----------------------------------------X

APPEARANCES:

For Plaintiffs:

      BRAGAR, WEXLER, EAGEL & MORGENSTERN, LLP
      885 Third Avenue, Suite 3040
      New York, New York 10022
      Of Counsel: Raymond A. Bragar, Esq.

      INDIK & McNAMARA, P.C.
      100 South Broad Street, Suite 2230
      Philadelphia, Pennsylvania 19110
      Of Counsel: Thomas S. McNamara, Esq.


For Defendants Arch Capital Group, Ltd., American Independent
      Insurance Holding Company, Joseph King & William B. Lockhorn:

      FRIEDMAN, WANG & BLEIBERG, P.C.
      90 Park Avenue
      New York, New York 10016
      Of Counsel: Peter N. Wang, Esq.
                  Susan J. Schwartz, Esq.

For Defendants TDH Capital Partners and TDH III, L.P.:

     PEPPER HAMILTON LLP
     3000 Two Logan Square
     Philadelphia, Pennsylvania 19103
     Of Counsel: Thomas E. Zemaitis, Esq.
               M. Duncan Grant, Esq.
               Joanna J. Cline, Esq.

**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

## INTRODUCTION

Defendants Arch Capital Group Ltd. ("Arch"), American Independent Insurance Holding Company ("AIIHC"), Joseph King ("King") and William B. Lockhorn ("Lockhorn") (collectively the "Arch Defendants") move to dismiss Plaintiffs' Second Amended Complaint ("SAC") under Rules 12(b)(1), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure. Defendants TDH Capital Partners) and TDH III, L.P. (collectively, "TDH") move to dismiss Counts III through V of the SAC insofar as those counts purport to state claims against them. For the reasons that follow, the Court grants the Arch Defendants' motion and dismisses the SAC with prejudice.

## PROCEDURAL BACKGROUND

On March 24, 2005, the Court granted the Arch Defendants' motions to dismiss Plaintiffs' First Amended Complaint. Small v. Arch Capital Group, Ltd., No. 03 Civ. 5604(JFK), 2005 WL 696903 (S.D.N.Y. Mar. 24, 2005). The Court determined that Plaintiffs had not adequately pleaded scienter with respect to their claim arising under Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"). The Court declined to exercise supplemental jurisdiction over the remaining state law claims. These dismissals were without prejudice. After Plaintiffs missed a Court-imposed deadline to file a second

3

amended complaint because of a technical defect, the Court closed the case.  The Court granted Plaintiffs' motion to vacate the judgment and allowed them to file a corrected complaint.  Small v. Arch Capital Group, Ltd., No. 03 Civ. 5604(JFK), 2005 WL 2584158 (S.D.N.Y. Oct. 12, 2005).  Plaintiffs timely filed the SAC.

Weighing in at seventy-eight pages, the SAC is even heftier than the First Amended Complaint.  Although the SAC contains many of the same allegations that appeared in the First Amended Complaint, it contains some significant additions.  For the sake of clarity, the Court will restate the entire factual background here rather than asking the reader to ping-pong between this Opinion and the one dismissing the First Amended Complaint.

FACTUAL BACKGROUND

On this Rule 12(b)(6) motion, the Court derives the facts from the SAC, all documents incorporated therein by reference, and other "integral" documents.  See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).  The Court accepts Plaintiffs' factual allegations as true and draws all reasonable inferences in Plaintiffs' favor.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

4

A.    __The Parties__

        The Small and Wilstein Plaintiffs (collectively, the
"Stockholder Plaintiffs") are disenchanted former stockholders of
Defendant AIIHC, which functioned as a holding company for its
subsidiary, American Independent Insurance Company ("AIICO").
(SAC ¶ 1.)  Prior to February 28, 2001, the Stockholder
Plaintiffs (along with BCI Holdings, Inc.) owned all of AIIHC's
issued and outstanding stock. (SAC ¶ 1.)[1]  Plaintiff Gitterman
provided legal and business services to AIIHC and AIICO and
served as a director of those companies from January 1995 to
February 28, 2001. (SAC ¶ 1, 25.)

        Defendant Arch is a Bermuda company. (SAC ¶ 26.)  AIIHC
is a Pennsylvania company that allegedly has been a subsidiary of
Arch since February 28, 2001. (SAC ¶ 27.)  The TDH entities are
former AIIHC creditors. (SAC ¶¶ 3, 43.)  King became a director
of AIIHC and AIICO. (SAC ¶ 30.)  Lockhorn has been president and
CEO of AIICO since 1996. (SAC ¶ 31.)

B.    __The Lederman Fraud and its Aftermath__

        During the 1990's, AIICO lost millions of dollars in a
fraud allegedly spearheaded by non-party Charles M. Lederman
("Lederman").  In essence, Lederman used reinsurance treaties
with, and referral arrangements involving, companies that he

---

        [1] BCI, formerly a plaintiff and later a nominal defendant in
this action, has transferred its interest in this matter to
Plaintiff Lewis Small.

controlled to divert funds belonging to AIICO into those
companies and into his own pocket. (SAC ¶¶ 8, 35-42.)   From 1995
to 2000, AIICO tried to survive as a family-owned business.
AIIHC and AIICO obtained additional capital by selling stock to
the Wilstein Plaintiffs and their children, and borrowing funds
from TDH in exchange for interest-bearing debt obligations and
warrants to purchase AIIHC shares. (SAC ¶ 43.)   In 1996, AIIHC
turned to Risk Capital Reinsurance Company ("Risk Reinsurance"),
the wholly owned subsidiary of Risk Capital Holdings, Inc. ("Risk
Capital") -- Arch's predecessor in interest -- for both
reinsurance and additional financial support. (SAC ¶¶ 44-45.)  By
2000, Risk Reinsurance had provided approximately $12.1 million
in contingent debt financing to AIIHC in return for warrants to
purchase AIIHC stock. (SAC ¶¶ 48, 51-52.)   Risk Reinsurance also
provided substantial reinsurance capacity to AIICO, replacing
AIICO's prior reinsurers. (SAC ¶ 48.)

On May 5, 2000, Risk Capital sold the reinsurance
operations of Risk Reinsurance and changed names from Risk
Capital to Arch Capital Group, Ltd. (SAC ¶ 56.)   In September
2000, defendant Arch was formed as a Bermuda public limited
company to serve as a holding company. (SAC ¶ 57.)   On November
8, 2000, the name of Arch Capital Group, Ltd. (formerly Risk
Capital) was changed to Arch Capital Group (U.S.), Inc., which

6

then became a wholly-owned subsidiary of defendant Arch.  Risk Capital's shareholders became Arch shareholders. (SAC ¶ 58.)

## C.    <u>The Lawsuits and D&O Claim</u>

Lederman's alleged fraudulent activity resulted in several lawsuits.  In 1997, AIICO commenced an action against Lederman and several others ("<u>Lederman</u>") in the United States District Court for the Eastern District of Pennsylvania. (SAC ¶ 8.)  In <u>Lederman</u>, AIICO primarily alleged RICO violations and fraud, and sought damages of approximately $6.1 million, potentially subject to trebling. (Agmt., Sched. 6.11.)[2]  William F. Kuntz ("Kuntz") of Seward & Kissel LLP was lead counsel to AIICO in <u>Lederman</u>.  (SAC ¶¶ 59-60.)  In August 2000, Judge Robert F. Kelly, the assigned district judge, denied most of the defendants' motions for summary judgment.  On May 30, 2001, Judge Kelly administratively closed <u>Lederman</u> and placed it on the suspense docket. (SAC ¶ 9.)

Aside from <u>Lederman</u>, AIICO commenced two other actions in Pennsylvania (the "State Lawsuits") arising out of Lederman's allegedly fraudulent actions. (SAC ¶ 59.)  Kuntz eventually came to represent AIICO in these lawsuits as well, having replaced the original counsel. (SAC ¶ 60.)  In September 2000, however, Small

---

[2] "Agmt." refers to the Reorganization Agreement dated December 31, 2000, which is incorporated into the SAC by reference.  This agreement appears in the record at Exhibit D to the Affidavit of Susan J. Schwartz, sworn to December 21, 2005.

and AIICO replaced Kuntz as lead counsel for the State Lawsuits with M. Mark Mendel ("Mendel").  Kuntz remained lead counsel for Lederman and played a supporting role to Mendel for the State Lawsuits. (SAC ¶ 62.)

In connection with the successful defense of Small against counterclaims in one of the State Lawsuits, AIIHC submitted a claim to its directors and officers liability insurance carrier (the "D&O Claim").  This carrier was an affiliate or subsidiary of American International Group ("AIG").  AIIHC sought approximately $460,000 in attorneys' fees from AIG. (SAC ¶ 64.)

**D.   The Reorganization Agreement**

**1.   Negotiations**

In October 2000, AIIHC began negotiating with Vesta Insurance Group, Inc. ("Vesta"), which was interested in acquiring AIIHC. (SAC ¶ 65.)  AIIHC also negotiated with Arch. (SAC ¶ 68.)  Plaintiffs allege that Arch threatened to hire away key AIIHC employees and to sue for breach of contract if AIIHC did not agree to an acquisition by Arch. (SAC ¶¶ 71-72.)  Plaintiffs also allege that Arch threatened to hire AIICO's president, Lockhorn, whose presence was an essential component of any transaction with Vesta. (SAC ¶ 71.)  On November 14, 2000, Arch presented AIIHC with a "take it or leave it" term sheet detailing Arch's proposal to acquire AIIHC.  Despite a better

8

offer from Vesta, AIIHC executed the Arch term sheet. (SAC ¶¶ 69,
74.)  On December 31, 2000, the Stockholder Plaintiffs, Arch,
AIIHC and the TDH Defendants entered into a Reorganization
Agreement (the "Agreement") (SAC ¶ 79.)  This Agreement closed on
February 28, 2001. (SAC ¶ 88.)

**2.   Relevant Agreement Provisions**

By its terms, the Agreement "sets forth the entire
understanding of the parties ... regarding the subject matter
hereof," with "[a]ny previous agreements or understandings
between the parties ... regarding the subject matter hereof, and
any amendments thereto" being "merged into and superseded by" the
Agreement. (Agmt. § 17.5.)  In the instant context, three
provisions in the Agreement are of primary importance.

**a.   Definition of "Lawsuits"**

The parties spend a good deal of time debating the
meaning of the term "lawsuit."  The Agreement provides:

> "Lawsuits" shall mean the State Lawsuits together
> with the Lederman Lawsuits and any other lawsuits
> or other actions which may arise out of or be in
> relation to or in connection with such lawsuits,
> whether or not involving the same claims or facts
> based on similar claims.

(Agmt. § 1.)  Plaintiffs contend that this definition embraces
the D&O Claim.  (SAC ¶¶ 78, 86.)  The Arch Defendants disagree.
(Arch Def. Mem. of Law at 12-13.)

### b.    **Allocation of Lawsuit Proceeds**

The Agreement provides that any proceeds or property derived from any of the so-called Lawsuits "shall immediately be paid over to [AIIHC] (and not to Lewis Small or any other Person)." (Agmt. § 4.1.)   The parties agreed that AIIHC would distribute the proceeds in the following order of priority:

> (a) FIRST, [AIIHC] to cover any and all unpaid fees and expenses incurred in connection with the Lawsuits ... and any expenses paid by [AIIHC] pursuant to clause (iv) of Section 9.10 hereof [the $500,000 commitment, which is discussed _infra_]; (b) SECOND, in the event that [AIIHC] receives [proceeds] in excess of amounts allocated ... pursuant to clause (a) above, Frederick Gitterman pursuant to [a] letter agreement ...;

(Agmt. § 4.1(a)-(b).)   Any remaining balance after payments to AIIHC and Gitterman would be shared among the Stockholder Plaintiffs, BCI, the AIICO Voting Trust and TDH. (SAC ¶ 4; Agmt. §§ 4.1, 4.2, Ex. A, F.)

### c.    **Administration of Lawsuits**

Perhaps the most important section of the Agreement for the purposes of the instant motions is Section 9.10.   The Court quotes this section in its entirety:

> 9.10    _Administration of Lawsuits_.   After the Closing, Lewis Small will continue to assist and manage the Lawsuits on behalf of [AIIHC] and TDH to the extent his health permits, subject to the following: (i) Small will provide [AIIHC] and TDH with all information relating to each Lawsuit, including the status thereof, and will consult with [AIHC] and TDH regarding the Lawsuits at any time requested by [AIIHC] or TDH; (ii) the prior written approval of [AIIHC] and TDH will be required for

10

> any strategic decisions relating to the Lawsuits, including without limitation settlement of all or a portion of any Lawsuit and the selection or removal of legal counsel or other professional advisors (provided that the Company and TDH will not agree to a settlement that does not provide for the release of Small as a defendant in the Lawsuits); (iii) Small agrees not to take any position that would, directly or indirectly, negatively affect in any material respect the reputation of [AIIHC], its shareholders, TDH or its partners; and (iv) [AIIHC] will continue to fund reasonable fees and reasonable expenses of the Lawsuits (based on appropriate supporting written invoices) up to a maximum of $500,000.

(Agmt. § 9.10.)  At bottom, Plaintiffs contend that Arch and AIIHC attempted to wrest control of the Lawsuits from Small and failed to honor the agreed-upon $500,000 commitment.

**E.   The Relationship Breaks Down**

**____1.   The Lawsuits**

In December 2000, just prior to the parties' execution of the Agreement, the State Lawsuits went to confidential binding high-low arbitration, guaranteeing Plaintiffs a minimum recovery of $3 million. (SAC ¶ 77.)[3]  Plaintiffs allege that Arch, at the time it entered into the Agreement, knew that the State Lawsuits would be transferred to binding arbitration and that only Lederman and the D&O Claim would remain pending. (SAC ¶ 78.)

---

[3] In "high-low" arbitration, a pre-arranged ceiling and floor vis-a-vis the award are in effect before the arbitration commences.  Regardless of the arbitrator's award, the defendant pays no less than the floor and no more than the ceiling.  See, e.g., John W. Cooley, New Challenges for Customers and Businesses in the Cyber-Frontier: E-Contracts, E-Torts, and E-Dispute Resolution, 13 Loy. Consumer L. Rev. 102, 114-15 (2001).

11

As for Lederman, Plaintiffs allege that Arch, AIIHC and
TDH failed to honor the Agreement by repeatedly acting to prevent
Small from managing the suit, and to usurp for themselves the
management of the suit. (SAC ¶ 92.)  On April 26, 2001, defendant
Lockhorn, AIICO's president and CEO, stated in a memorandum to
Small that Arch "had taken 'a very active interest' in the
Lederman Lawsuit" and that "Arch wanted 'to define ... the
billing situation with Kuntz before proceeding with any further
activity on the case." (SAC ¶ 96.)  On behalf of Arch, AIICO, and
TDH, Lockhorn directed Small to submit weekly reports concerning
Lederman and a time line of key events." (SAC ¶ 96.)  In the
weeks following this memorandum, Plaintiffs allege, Lockhorn
"repeatedly criticiz[ed] and hound[ed] Lewis Small for failing to
meet meaningless deadlines unilaterally set by [AIIHC/AIICO
director] King and Lockhorn" in an attempt to coerce Small to
relinquish his role as manager of Lederman and the State
Lawsuits.  On or about May 25, 2001, Lockhorn suggested as much
in another memorandum to Small, but Small refused to step aside.
(SAC ¶ 98.)

Between June and November 2001, Small communicated
several concerns about the litigation to Kuntz, King, and
Lockhorn. (SAC ¶ 100.)  At a July 26, 2001 meeting, attended by
Small, Kuntz, King, Lockhorn, and representatives from AIICO and
TDH, Small's recommendations concerning the listing of fact and

12

expert witnesses were voted down. (SAC ¶ 102.)  On November 19, 2001, due to continuing disagreements over the listing of witnesses in <u>Lederman</u>, Small recommended to Arch, AIIHC, AIICO, and TDH that Kuntz be replaced as lead counsel. (SAC ¶ 105.) Despite alleged criticism of Kuntz from attorneys participating in the State Lawsuits, including lead counsel Mendel, and despite what Plaintiffs characterize as "pointed criticism" of Kuntz from Judge Kelly,[4] Lockhorn, at the behest of AIIHC, Arch, and TDH, insisted on retaining another attorney for a second opinion. (SAC ¶¶ 106, 113.)  This attorney ultimately concurred with Small's view of Kuntz's work and recommended discharge. (SAC ¶ 107.)

On January 11, 2002, a representative of TDH informed Small that no change in counsel would be made unless Small agreed to a modification of his role in managing <u>Lederman</u>. (SAC ¶ 108.) On April 11, 2002, AIICO finally discharged Kuntz, but without retaining substitute counsel. (SAC ¶ 110, 112.)[5]  Plaintiffs allege that the second opinion was a "sham" designed to delay <u>Lederman</u>, resulting in the unnecessary exhaustion of

---

[4] In his order denying summary judgment, Judge Kelly wrote: "In this case, Plaintiffs, at times, fail to fully respond to arguments presented in the motions for summary judgment; however, this does not automatically entitle the movants to judgment." <u>Am. Indep. Ins. Co. v. Lederman</u>, No. CIV.A 97-4153, 2000 WL 1209371, at *5 (E.D. Pa. Aug. 25, 2000). (SAC ¶ 62.)

[5] Plaintiffs allege in paragraph 110 of the SAC that <u>AIIHC</u> terminated Kuntz.  Elsewhere, they allege that <u>AIICO</u> terminated him.  The latter allegation is probably correct.

approximately twenty percent of AIIHC's $500,000 funding
commitment. (SAC ¶¶ 113-14.)  In addition, Plaintiffs allege that
the continuing failure of Lockhorn and King to instruct Kuntz to
follow Small's recommendations concerning the listing of
witnesses was "beyond reckless, and can only be seen as
malicious." (SAC ¶ 115.)

    **2.    The $500,000 Funding Commitment**

        Beginning in November 2001, approximately eleven months
after execution of the Agreement, Lockhorn began to warn Small
that the $500,000 funding commitment was running out. (SAC ¶
116.)  In April 2002, AIIHC informed Small that it did not intend
to fund <u>Lederman</u> over the $500,000 maximum and that the remaining
funds would not cover the expenses and fees involved with the
suit. (SAC ¶ 119.)  After Kuntz's discharge that same month,
Lockhorn informed Small that the $500,000 commitment had been
exhausted. (SAC ¶ 112.)  On June 14, 2002, Lockhorn forwarded to
Small, without invoices, a list ("First Attorney Expense
Statement") of fees and expenses that totaled $307,151,86. (SAC ¶
120.)  Lockhorn then informed Small that AIIHC actually had
exceeded the $500,000 commitment by $100,000. (SAC ¶ 121.)  Small
and the Wilstein Plaintiffs requested invoices, but Lockhorn
declined to provide them, citing expense. (SAC ¶ 122-25.)

        On September 26, 2002, AIIHC permitted Small to inspect
certain invoices, but not to copy them. (SAC ¶ 126.)  After

completing his inspection, Small decided that AIIHC had improperly calculated expenses against the $500,000 commitment, primarily because some of the expenses were paid prior to the closing of the Agreement, some were for non-lawsuit related activities (such as counsel fees incurred in connection with an FBI criminal investigation of Lederman's activities), and some reflected accrual of Kuntz's unpaid legal fees.  Perhaps most importantly, Plaintiffs allege that the $307,151.86 in the First Expense Statement was not applicable toward the commitment because these expenses were entirely recaptured as a result of proceeds derived from some of the lawsuits. (SAC ¶ 127, 130-33.)

### 3.    The D&O Claim

Plaintiffs steadfastly maintain that the D&O Claim, which arose out of the defense of a counterclaim asserted against Small in one of the State Lawsuits, qualifies as a "Lawsuit" under the Agreement. (SAC ¶ 86.)  On September 16, 2002, Lockhorn informed Small that funds from the D&O proceeds, if any, would be used to offset AIICO expenses incurred subsequent to the previous offset, which involved proceeds from the binding arbitration. However, Lockhorn warned Small: "We are not convinced that the likely recover[y] will exceed an amount that will create an adjustment in the expenses so that they are less than the $500,000 ceiling." (SAC ¶ 125.)

### F.    Scienter Allegations

In response to the Court's dismissal of the 1934 Act claim in the First Amended Complaint because Plaintiffs failed to adequately allege scienter, Plaintiffs include fifty-six paragraphs of new allegations in the SAC addressed to motive and recklessness.

### 1.    Motive and Opportunity

Plaintiffs allege that Arch had the motive to commit fraud by misrepresenting its intentions concerning Lederman and the D&O Claim.  Plaintiffs piece together conflicting motives that are supposed to explain Arch's allegedly fraudulent activities.  On the one hand, Arch wanted to minimize out-of-pocket expenses in connection with the Agreement and the acquisition of AIIHC. (SAC ¶ 136-37.)  By structuring the consideration for the purchase to include a share of proceeds from Lederman or the D&O Claim, and a commitment to spend $500,000 to fund the lawsuit, Arch reduced its expenses and left the balance of the purchase price contingent on the proceeds of Lederman and the D&O Claim. (SAC ¶ 137.)  On the other hand, while AIIHC and Arch stood to benefit from funds received in connection with Lederman and the D&O Claim, the potential benefits to Arch paled in comparison to the risks that continued pursuit of Lederman and D&O Claim posed to the business interests of Arch, its major shareholders, investment partners, brokers, and reinsurers. (SAC ¶ 138.)  Plaintiffs explain that these

16

conflicting motives caused Arch to acquire AIIHC by promising to pursue the lawsuits, while secretly resolving never to actually pursue them. (SAC ¶ 139.)

Plaintiffs' often confusing allegations boil down to one basic contention:  pursuit of Lederman and the D&O Claim would hurt Arch's potential reinsurance business, and Arch knew it at the time the Agreement was executed.  Plaintiffs allege that Arch never disclosed during negotiations that it intended to capitalize a Bermuda-based reinsurance company or otherwise engage in the reinsurance business.  Yet, only two months after the Agreement closed, Arch filed a Form 10-K with the SEC which stated: "[W]e intend to capitalize a Bermuda-based reinsurance company, which will underwrite business produced by intermediaries, underwriting agencies and insurance companies owned by or affiliated with us, as well as business produced by third parties." (SAC ¶ 143.)  Plaintiffs point out that just before the Agreement's execution, Arch had acquired a merchant banking firm specializing in the insurance industry. (SAC ¶ 146.)

In addition, the only solvent defendant in Lederman was Rockwood Casualty Insurance Company ("Rockwood").  Plaintiffs call Rockwood a "potential, if not actual" client of Arch's shareholders, subsidiaries, affiliates, or the insurance companies in Arch's investment portfolio. (SAC ¶ 147.) Plaintiffs contend that a May 2001 acquisition of Rockwood's

17

parent company by the Argonaut Insurance Group, Inc. ("Argonaut")
presented a business opportunity for Arch.  The primary line of
insurance business underwritten by Argonaut's subsidiaries is
workers' compensation insurance.  Given Arch's alleged
undisclosed intention to capitalize a Bermuda-based reinsurer and
reenter the insurance business, the Argonaut deal represented
"potentially lucrative sources of [reinsurance] business" not
only to Arch, but to Arch's largest shareholder, Marsh & McLennan
Risk Capital Holdings, Ltd. ("Marsh"). (SAC ¶¶ 148-72.)
Plaintiffs contend that Marsh "dominated" Arch and AIIHC at all
relevant times before and after the negotiation of the Agreement,
and that Arch had a powerful motive to act in Marsh's best
interests. (SAC ¶ 156.)  In Plaintiffs' view, Marsh stood to gain
more from reinsurance brokerage income deriving from the
Rockwood-Argonaut deal than from Lederman and D&O proceeds. (SAC
¶ 172.)

        Plaintiffs also find motive for Arch and AIIHC's
alleged refusal to press the D&O Claim.  On information and
belief, Plaintiffs allege that AIG was the corporate parent of
the underwriter of AIICO's D&O policy, and also held a
substantial ownership interest in Arch itself. (SAC ¶ 174.)
Plaintiffs base this allegation on letters sent by Joseph
Timoney, an AIICO vice president, to plaintiff Gitterman,

18

indicating that AIG owned up to a twenty percent interest in
Arch. (SAC ¶ 175.)   Timoney wrote in one such letter:

> In regard to your comment about AIG's ownership of
> Arch, we are a bit confused ....  As you know, one
> of AIG's subsidiaries is the underwriter on the D&O
> coverage where we have filed the claim.   To the
> best of our knowledge AIG does not own more than a
> 10% interest in Arch Capital Group, Ltd.

(Schwartz Aff., Ex. E.)   Despite the confusion, Plaintiffs allege
that Arch's relationship with AIG made it "substantially less
likely" that AIIHC would pursue its claim to recover $460,000 in
legal fees from AIG as part of the D&O policy. (SAC ¶ 177.)

### 2.   Conscious Misbehavior or Recklessness

For all of the reasons already discussed, Plaintiffs
contend that Arch acted, if not with intent, with extreme
recklessness when it entered into the Agreement. (SAC ¶ 181.)
With respect to the $500,000 commitment, Plaintiffs contend that
"Arch and [AIIHC] did not repudiate their respective obligations
under the ... Agreement, but instead maintained that they were
entitled to [cease funding the lawsuits] in accordance with the
terms of the ... Agreement." (SAC ¶ 186.)   In Plaintiffs' view,
"Arch effectively admitted that such action was consistent with
its intentions at the time it executed the Reorganization
Agreement." (SAC ¶ 187.)   Plaintiffs allege (once again) that
Arch's actions "give rise to a strong inference that Arch never
intended ... to pursue the Lederman Lawsuit and D&O Claim to
conclusion." (SAC ¶ 188.)   In addition, Plaintiffs accuse Arch of

19

breaching the Agreement within weeks after closing, also giving rise to a strong inference of scienter. (SAC ¶ 189.)

## G.  **Plaintiffs' Claims**

Count I of the SAC is a claim by the Stockholder Plaintiffs against Arch for securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. (SAC ¶¶ 190-203.)  As was the case with the First Amended Complaint, Count I is the jurisdictional hook.  Count II is a common law fraud claim by the Stockholder Plaintiffs against Arch. (SAC ¶¶ 204-213.)  Count III is a breach of fiduciary duty claim by the Stockholder Plaintiffs against Arch, AIIHC and TDH. (SAC ¶¶ 214-20.)  Count IV is a breach of contract claim by all Plaintiffs against Arch, AIIHC and TDH. (SAC ¶¶ 221-28.)  Count V is a civil conspiracy claim by all Plaintiffs against all Defendants. (SAC ¶¶ 229-33.)  Plaintiffs seek an unspecified amount of compensatory damages, punitive damages on Counts II, III, and V, pre-judgment and post-judgment interest, and any other relief that the Court deems proper.

DISCUSSION

## I.    RULE 12(b)(6) STANDARD

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court's task is to assess the legal feasibility of the claim rather than to weigh the evidence that might be offered in support thereof.  See, e.g., Geisler v.

20

Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980).  Defendants' motion
will be granted only if it appears beyond doubt that Plaintiffs
can prove no set of facts in support of their claim that would
entitle them to relief.  See Sweet v. Sheahan, 235 F.3d 80, 83
(2d Cir. 2000).

## II.  COUNT I: SECURITIES FRAUD

### A.    Section 10(b) and Rule 10b-5

        To state a claim for a violation of Section 10(b) of
the 1934 Act and Rule 10b-5, "a plaintiff must plead that the
defendant, in connection with the purchase or sale of securities,
made a materially false statement or omitted a material fact,
with scienter, and that the plaintiff's reliance on the
defendant's action caused injury to the plaintiff."  Ganino v.
Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).  The
plaintiff also must satisfy the heightened pleading standards of
Rule 9(b) and the Private Securities Reform Litigation Act of
1995 ("PSLRA").  Rule 9(b) provides: "In all averments of fraud
or mistake, the circumstances constituting fraud or mistake shall
be stated with particularity."[6]  Accordingly, the complaint
"must: (1) specify the statements that the plaintiff contends

---

        [6] The PSLRA provides that if the plaintiff alleges a
misstatement or omission of material fact, "the complaint shall
specify each statement alleged to have been misleading, the
reason why the statement is misleading, and, if an allegation
regarding the statement or omission is made on information and
belief, the complaint shall state with particularity all facts on
which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Stevelman v. Alias Research Inc.</u>, 174 F.3d 79, 84 (2d Cir. 1999) (citation omitted).

**B.   <u>Scienter Element</u>**

In securities fraud cases, the Rule 9(b) scienter pleading standard in this circuit is as follows:

> [P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent, which may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

<u>Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co.</u>, 375 F.3d 168, 187 (2d Cir. 2004) (internal quotations marks omitted); <u>see</u> <u>Shields v. Citytrust Bancorp.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994) ("[T]o serve the purposes of Rule 9(b), we require plaintiffs to allege facts that give rise to a strong inference of fraudulent intent."). The Second Circuit has held that the 1995 enactment of the PSLRA "did not change the basic pleading standard for scienter in this circuit." <u>Novak v. Kasaks</u>, 216 F.3d 300, 310 (2d Cir. 2000).

**1.   Arch's Alleged Breaches of the Agreement**

The SAC is replete with allegations that Arch did not meet its contractual obligations. "The failure to carry out a

promise made in connection with a securities transaction is
normally a breach of contract.  It does not constitute fraud
unless, when the promise was made, the defendant secretly
intended not to perform or knew that he could not perform."
Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir.
1993).  Plaintiffs contend that Arch "never intended to perform
the specific promises that made [sic] in the [Agreement]
regarding the continued funding and management of [Lederman] and
the D&O Claim at the time it made such promises."  (SAC ¶ 11.)

        In its order dismissing Plaintiffs' First Amended
Complaint, the Court found that Plaintiffs had alleged little
more than breach of contract claims, not securities fraud claims.
As the Circuit has written:

>       Normally, allegations of mere nonperformance under
>       a contract do not provide strong evidence of
>       fraudulent intent.... In such circumstances,
>       fraudulent intent may only be inferred "when a
>       defendant violates an agreement so maliciously and
>       so soon after it is made that his desire to do so
>       before he entered into the agreement is evident.

Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d
655, 664 (2d Cir. 1997) (quoting Powers v. British Vita, P.L.C.,
57 F.3d 176, 185 (2d Cir. 1995)).  In the previous order, the
Court strained unsuccessfully to find any facts that would lead
to an inference that Arch maliciously violated the Agreement soon
after its execution.  The Court also took note of Plaintiffs'
argument, intended to overcome a statute-of-limitations problem,

23

that "none of the events plead [sic] in the Amended Complaint as having occurred between the period between February 28, 2001 and June 30, 2001 suggested the probability that Arch secretly intended not to ever perform its obligations when it executed the Agreement." Small v. Arch Capital Ltd., No. 03 Civ. 5604(JFK), 2005 WL 696903, at *8 (S.D.N.Y. Mar. 24, 2005).  Accordingly, the Court found that allegations concerning Small's management of the lawsuits (maybe a breach, but not a malicious one) and the $500,000 commitment (perhaps a breach, but not that soon after the Agreement) did not provide the necessary factual predicate to establish scienter.

Plaintiffs spend a significant portion of their brief objecting to the Court's application of Campaniello Imports.  The instant motion to dismiss the SAC does not double as a motion for reconsideration of the Court's previous order.  In any event, the Court adheres to its view that the rule in Campaniello Imports disposes almost entirely of this matter.  Even if the rule did not exist, however, Plaintiffs' complaint fails to satisfy the scienter standard because it does not sufficiently allege facts showing that Arch had the motive and opportunity to commit fraud, or facts constituting strong circumstantial evidence of conscious misbehavior or recklessness on Arch's part.

a.   **The Lawsuits**

24

Plaintiffs allege that Arch committed securities fraud because Arch and AIIHC refused to pursue <u>Lederman</u>.  More specifically, Plaintiffs accuse Arch of participating in a scheme to deprive Small of his management role over <u>Lederman</u>.  As the Court discussed in the previous Order, these allegations barely state a claim for a breach of contract, let alone a malicious one.  <u>Small</u>, 2005 WL 696903, at *8.  Under Section 9.10 of the Agreement, quoted <u>supra</u>, p. 10-11, the final say on matters concerning "strategic decisions" belonged to AIIHC and TDH. Small's role was to "assist and manage the Lawsuits on behalf of [AIIHC] and TDH."  The dispute between the parties over Kuntz's discharge and other issues concerning <u>Lederman</u> essentially comes down to a disagreement over the meaning of "strategic" and "assist and manage."

A securities fraud claim based on a contractual dispute requires some indicia that defendant never intended to perform its end of the bargain.  By alleging malicious breaches soon after the execution of the contract, the plaintiff establishes at least an inference that the defendant secretly intended not to perform.  This is the point of the test in <u>Campaniello Imports</u>. If it were otherwise, any contract dispute arising after a transaction involving securities potentially could state a Section 10(b) claim.  To make Arch's conduct seem more egregious than it is, Plaintiffs include allegations that Lockhorn

repeatedly hounded Small for status reports and criticized him for failing to meet deadlines.  Lockhorn's demands, even if annoying, arguably comported with Section 9.10, which specified that Small was to give AIIHC and TDH "all information" concerning the lawsuits, "including the status thereof," and that he was to consult with AIIHC and TDH "at any time requested by [AIIHC] and TDH." (Agmt. § 9.10(i).)  Again, there is scant indication of a breach of contract here, and certainly not a malicious one.

Plaintiffs attempt to analogize this situation to Powers v. British Vita, P.L.C., 57 F.3d 176 (2d Cir. 1995), cited in Campaniello Imports.  In Powers, Lawrence Powers ("Powers"), the former chairman and chief executive officer of Spartech Corporation ("Spartech"), sued British Vita, P.L.C. ("BV") for common law fraud and civil RICO violations arising out of BV's purchase of shares and assumption of control of Spartech.  BV and Spartech entered into agreements by which BV acquired a minority interest in Spartech.  The agreements were designed to ensure that Powers maintained management of Spartech and that BV would not get a majority voting share.  As the Circuit explained:

> The ink was hardly dry on the three agreements before BV began to undermine Powers's authority in order to gain control of Spartech.  Powers alleges that BV's chairman began to avoid Powers, Powers's picture was left out of BV's newsletter that covered its management conferences and BV's annual report, and [the individual defendants], board members designated by BV, openly criticized Powers at board meetings and to Spartech management, including Powers's own subordinates.

26

Powers, 57 F.3d at 182.  BV then recruited one of Powers' more
ambitious lieutenants to help bring about Powers' removal.  BV
also backed out of a separation agreement with Spartech,
allegedly to undermine Powers' credibility.  Powers eventually
resigned and BV, according to Powers, achieved effective control
of Spartech.  Id. at 182-83.  After finding that Powers did not
satisfy the "motive and opportunity" prong, the majority, over a
dissent by Judge Newman, applied the "so maliciously and so soon
after" test to the "conscious misbehavior or recklessness" prong
and found that Powers satisfied it.  Id. at 185.

        Plaintiffs argue that Powers, like the instant case,
involved "ongoing, seemingly minor conduct which commenced soon
after the agreement was made, and later escalated, but did not
achieve its aim until two years later."  (Pl. Mem. of Law at 43.)
In the instant case, Plaintiffs say, "before the ink on the
relevant contracts dry [sic], the Arch Defendants began to
criticize Lewis Small, to undermine his authority to manage
[Lederman] and to seek to effectuate his removal, in order to
prevent [AIIHC] from continuing to pursue [Lederman] against
Rockwood." (Pl. Mem. of Law at 44-45.)  The allegations in the
SAC, to the extent they are specific at all, do not support
Plaintiffs' argument, however.  The hounding of Small and all of
the disputes over the lawsuits arose out of disagreements over
the meaning of the Agreement.  And they arose not immediately

27

after execution, as in <u>Powers</u>, but months later -- in the weeks following Lockhorn's memorandum to Small on April 26, 2001.

In addition, one of the primary purposes of the contracts was to ensure that BV did not get control of Spartech over Powers's objection.  Once the contract was signed, BV took unmistakable steps to frustrate that purpose and to force Powers to resign.  In the instant case, Arch's conduct immediately post-Agreement does not indicate a desire to frustrate the Agreement at the time of execution.  As the Court discusses <u>supra</u>, p. 26, the so-called "hounding" of Small, which began in the weeks after April 26, 2001 (SAC ¶¶ 96-97), arguably has some basis in Section 9.10 of the Agreement itself.  And it certainly is worth noting that the SAC nowhere says that the hounding became so intolerable that Small had to relinquish his role with respect to <u>Lederman</u> or the other lawsuits.  In fact, when Lockhorn suggested that Small relinquish control, Small refused.  After that point, from June through November 2001, Small became very active in <u>Lederman</u>, and "repeatedly communicated, orally and in writing, several specific, serious concerns and recommendations ... to attorney Kuntz." (SAC ¶ 100.)  In these respects, Small's situation in no way resembles Powers's dilemma.

In new allegations, Plaintiffs attempt to construct a motive for Arch's alleged refusal to pursue the lawsuits. Plaintiffs allege that Arch intended to enter the reinsurance

business, and that the only solvent defendant in Lederman, Rockwood, was a potential or actual client of companies with some relationship to Arch.  Even more speculatively, Plaintiffs construct a relationship between Rockwood's parent company (Argonaut) and Arch's largest shareholder (Marsh).  They go so far as to say, without any factual support, that Marsh "dominated" Arch and that Arch ignored Lederman because Marsh stood to gain from a potential deal with Rockwood/Argonaut.

       Plaintiffs have not alleged facts showing that Arch had motive and opportunity to commit fraud.  "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994). Plaintiffs do not specify the concrete benefits that Arch may have obtained by ignoring a $6.1 million lawsuit, subject to trebling, in return for nebulous business opportunities of unspecified value.  Nor do Plaintiffs allege how Arch would have achieved those opportunities by ignoring Lederman.  Instead, Plaintiffs weave a confusing web of speculative relationships between Arch, Rockwood, Marsh and other companies in the hope that one of the allegations concerning Lederman will stick.

Plaintiffs also fail to allege conscious misbehavior or recklessness on Arch's part with respect to the lawsuits.  By Plaintiffs' own concession, the <u>Campaniello Imports</u> test is applicable to this prong of the scienter analysis. (Pl. Mem of Law at 26.)  The Court already had decided that Plaintiffs do not satisfy that test here.  Even if <u>Campaniello Imports</u> did not exist, Plaintiffs could not establish misbehavior or recklessness.  Conscious misbehavior is defined as "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information ... or knowing sale of a company's stock at an unwarranted discount." <u>Novak v. Kasaks</u>, 216 F.3d 300, 308 (2d Cir. 2000).  There is no allegation that Arch acted illegally with regard to the lawsuits, or anything else.  Recklessness is "at least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." <u>Id.</u> (internal quotation marks omitted).  As the Court has stated, the dispute over the lawsuits boils down to a disagreement about the language in Section 9.10 of the Agreement.  Neither side has taken an outlandish position in the debate.  There is no highly unreasonable conduct that would support an inference that Arch never intended to perform its side the Agreement.

30

Consequently, whether the Court analyzes Plaintiffs'
allegations concerning <u>Lederman</u> under <u>Campaniello Imports</u>, the
"motive and opportunity" test, or the "conscious misbehavior or
recklessness" test, the allegations fail to establish that Arch
acted with scienter.  Plaintiffs' allegations concerning the
State Lawsuits are even more vague.  Plaintiffs claim that Arch
knew, or had reason to know, at the time of the Agreement, that
the suits would be transferred to binding arbitration, that AIIHC
would not incur additional expenses in connection with the suits
and that only <u>Lederman</u> and the D&O Claim would remain unresolved
following the arbitration. (SAC ¶ 78.)  These allegations add
nothing to the mix because, like most of Plaintiffs' allegations,
they are entirely speculative.

### b.   **The $500,000 Funding Commitment**

The dispute over AIIHC's funding commitment also
centers on Section 9.10 of the Agreement.  Again, as the Court
found in its Order dismissing the First Amended Complaint, <u>Small</u>,
2005 WL 696903, at *9, the allegations do not satisfy the rule in
<u>Campaniello Imports</u>.

Plaintiffs include in the SAC a new allegation that
Arch "did not record any or report any liability in connection
with the $500,000 funding obligation undertaken by [AIIHC] in the
[Agreement], whether in its Quarterly Report on Form 10-Q for the
period ended June 30, 200 [sic], or in its Annual Report on Form

31

10-K for the year ended December 31, 2001."[7]  Plaintiffs hope
that the Court will infer that these alleged nondisclosures
evidence Arch's secret intent not to honor the commitment.  They
do not.  First, Plaintiffs fail to allege that Arch <u>had</u> to
disclose in those reports any liability or contingency in
connection with the $500,000 commitment.  Second, the Forms 10-Q
and 10-K came six months and one year, respectively, after
formation of the Agreement and have scant relevance to Arch's
intent at the time the Agreement was signed.  Third, and most
importantly, Arch's Form 8-K, dated March 15, 2001, discloses the
$500,000 obligation by submitting the entire Agreement as an
exhibit and referring to that exhibit in page three of the text.
(Schwartz Aff., Ex. G.)[8]  Thus, the new allegation does not show
that Arch maliciously breached the Agreement with respect to
AIIHC's obligation to fund the lawsuits.

    The SAC also contains several new paragraphs of
allegations concerning Small's quest to inspect invoices and
other documents pertaining to the commitment.  But these
allegations involve Lockhorn and AIIHC, not Arch.  Even if it
were true that Lockhorn, on behalf of AIIHC, was trying to get

---

[7] The Court presumes that Plaintiffs refer to Arch's Form
10-Q for the period ended June 30, 2001.

[8] Arch's Form 8-K is a public filing and may be considered
on this motion to dismiss.  <u>See</u> <u>Cortec Indus., Inc. v. Sum
Holding L.P.</u>, 949 F.2d 42, 47-48 (2d Cir. 1991).

32

around the $500,000 commitment, Plaintiffs would have to allege
specific conduct by Arch in order to assert a securities fraud
claim against Arch.  It is not enough to say, as Plaintiffs do,
that Lockhorn "communicated and conferred with ... King and other
representatives of Arch on a regular basis concerning the
Lawsuits, and sought and obtained Arch's approval regarding
[AIIHC's] plans" concerning the commitment. (SAC ¶ 182.)  Even if
such an allegation could support a securities fraud claim against
Arch, the entire dispute comes down to a disagreement over
Section 9.10, which does not make clear what it means for AIIHC
to "continue to fund reasonable fees and reasonable expenses of
the Lawsuits (based on appropriate supporting invoices) up to a
maximum of $500,000."  It is too much of a stretch to say that
Arch's position represents such a malicious breach of the
Agreement that one can infer that Arch never intended to allow
AIIHC to honor the commitment.

In fact, a fair reading of the SAC, even in the light
most favorable to Plaintiffs, supports the opposite conclusion.
There are no allegations that Arch and AIIHC flat-out refused to
pay the $500,000, or paid a minuscule amount and then disclaimed
the obligation.  As quoted supra, p. 19, Plaintiffs state in
paragraph 186 of the SAC that Arch "did not repudiate" its
obligations under the Agreement and that Arch "maintained" that
it acted "in accordance with the terms of the [Agreement]."  In

33

addition, Lockhorn told Small six months after execution of the Agreement that AIIHC had paid out $600,000 in expenses, $100,000 more than the contractual commitment. (SAC ¶ 121.)  Plaintiffs do not dispute the veracity of Lockhorn's statement.  What they dispute is the method of calculation.  There may be enough of a question of fact here for a breach of contract claim to survive a motion to dismiss, but not a securities fraud claim.

In addition, the dispute over the $500,000 commitment did not arise until November 2001 at the earliest, when Lockhorn warned Small that the money was beginning to run out.  This was nearly one year after the execution of the Agreement, and there are no specific allegations of misconduct beginning soon after execution.  Primarily, this dispute is over whether AIIHC was entitled to credit its expenses against the $500,000 when it recaptured those expenses from the Lawsuits.  Plaintiffs say no; the Arch Defendants say yes; the Agreement is unclear.  As the Court found in its previous order, Plaintiffs' allegations do not establish any likelihood of a malicious breach by Arch.

Plaintiffs do not allege much in the way of motive and opportunity with respect to the $500,000 commitment, except to say that Arch made this promise as a means of reducing the expense necessary to acquire AIIHC.  This desire to save money when concluding a deal is hardly a concrete benefit that supports a securities fraud claim.  See Ganino v. Citizens Utils. Co., 228

34

F.3d 154, 170 (2d Cir. 2000) ("General allegations that the
defendants acted in their economic self-interest are not
enough."). On the subject of conscious misbehavior and
recklessness, Arch's interpretation of their contractual
obligation is not so unreasonable that the Court must consider it
reckless and indicative of scienter.

Plaintiffs attempt to save the situation with an
implausible argument concerning a purported "constructive
admission" by Arch that it never intended to perform its
obligations under the Agreement. This argument goes as follows.
After delaying disclosure of documentation concerning the
expenses credited to the $500,000 commitment, Arch allowed Small
to examine certain documents. Small concluded, based on this
examination, that Arch caused AIIHC to improperly apply certain
costs to the commitment. Plaintiffs conclude that "[t]he conduct
and statements of [AIIHC] in claiming credit, and of Arch in
causing and permitting [AIIHC] to claim credit, for such costs
and expenses amounted to a constructive denial by Arch that it
ever promised that [AIIHC] would fund the Lawsuits in the manner
alleged in the Complaint, and thus support a strong inference
that Arch never intended to fulfill its promise to cause and
permit the Company to do so." (Pl. Mem. of Law at 38.)

Plaintiffs find another "constructive denial" of Arch's
obligation in Lockhorn's statement that AIIHC would apply any

35

proceeds recovered from the D&O Claim to the $600,000 in expenses
"by which [AIIHC] wrongfully claimed to have satisfied its
$500,000 funding obligation." (Pl. Mem. of Law at 39.)

        The Court rejects these arguments.  If the D&O Claim
were a "Lawsuit," as Plaintiffs claim, then AIIHC was entitled
under Section 4.1(a) to use proceeds from the claim against its
Lawsuit-related expenses.  Plaintiffs' allegation that AIIHC
improperly calculated those expenses does not lead to an
inference that Arch <u>denied</u> any of its obligations (to the extent
it had any) concerning the lawsuits.  Moreover, this argument
contradicts Plaintiffs' own assertion in the SAC that Arch "did
not repudiate" its obligations under the Agreement.  The cases
cited by Plaintiffs, <u>Wortley v. Camplin</u>, 333 F.3d 284 (1st Cir.
2003); <u>Drexel Burnham Lambert Group, Inc. v. Microgenesys, Inc.</u>,
775 F. Supp. 660 (S.D.N.Y. 1991); <u>Goshen Litho, Inc. v. Kohls</u>,
582 F. Supp. 1561 (S.D.N.Y. 1983), are all distinguishable.
<u>Wortley</u> involved an admission by the defendant that he had no
intention to perform his agreement.  <u>Wortley</u>, 333 F.3d at 286-91,
295.  <u>Drexel Burnham</u> involved an outright denial by the
defendant's attorney that the defendant had any obligations under
a note it had given the plaintiff in exchange for $1,000,000.
<u>Drexel Burnham</u>, 775 F. Supp. at 662-63.  <u>Goshen Litho</u> was a
summary judgment motion in which Judge Haight concluded that the

36

evidence in the record supported at least an inference of fraudulent intent.  Goshen Litho, 582 F. Supp. at 1564.

The Court finds that Plaintiffs have not alleged that Arch acted with scienter with respect to AIIHC's $500,000 commitment in Section 9.10 of the Agreement.

### c.   The D&O Claim

Plaintiffs' allegations concerning the D&O Claim are premised on their contention that the claim is a "lawsuit" under Section 1 of the Agreement.  The Court is skeptical, but the argument might have merit.  Even if the claim were a "lawsuit," then AIIHC's failure to pursue it, or to allow Small to pursue it, could constitute a breach of Section 9.10.  But this breach hardly would be malicious, per Campaniello Imports, because there is a plausible argument that the D&O Claim is not a "lawsuit" at all, and thus not subject to Small's management under Section 9.10.  Again, the parties are stuck in a dispute over contractual language.  There is no indication of a malicious breach by Arch.

Arch's supposed motive for failing to follow through on the D&O Claim was to protect AIG from having to make payment on the claim.  Plaintiffs allege that AIG held a twenty percent interest in Arch, but the Timoney letter, cited by Plaintiffs, does not support this allegation ("To the best of our knowledge AIG does not own more than a 10% interest in Arch Capital Group, Ltd.").  Even if the allegation were true, the Court already has

37

rejected the argument that Arch and AIG had an improper relationship with respect to the D&O Claim.  <u>Small</u>, 2005 WL 696903, at *9.  This argument has not changed in any material way.  Nothing in the SAC shows that Arch would obtain concrete benefits by ignoring a potentially valid $460,000 D&O Claim.  Nor are there new allegations that impel the Court to revisit its finding that there is no strong circumstantial evidence of conscious misbehavior or recklessness on Arch's part.  <u>Id.</u> at *10.

### d.   <u>Other Allegations</u>

There are many other allegations in the SAC.  Some are new (the negotiations with Vesta and the statement that Section 9.10 created a "joint venture), and others appeared in the First Amended Complaint.  None of these allegations helps Plaintiffs past the Rule 9(b) pleading hurdle for a Section 10(b) claim.

### CONCLUSION

The Arch Defendants' motion to dismiss the SAC is granted.  Count I fails to state a claim for securities fraud under Section 10(b) of the 1934 Act and Rule 10b-5.  Counts II through V -- the common law claims -- are dismissed because the Court declines to exercise supplemental jurisdiction over them. <u>See</u> 28 U.S.C. § 1367(c)(3).  This Order constitutes the second Rule 12(b)(6) dismissal of Plaintiffs' claims.  Another round of

pleading would be futile; thus, the dismissals are with prejudice.  The case is closed, and the Court orders it removed from the active docket.

      **SO ORDERED.**

**Dated:**  **New York, New York**
       **September** $20$ **, 2006**

                                         **JOHN F. KEENAN**
                            **United States District Judge**